IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:04CV60-2-V
(5:00CR46-01-V)


| | | |
|---|---|---|
| THEODORE THOMAS WADDELL, | ) | |
|     Petitioner, | ) | |
| | ) | |
|        v. | ) | O R D E R |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
|     Respondent. | ) | |
| | ) | |


**THIS MATTER** is before this Court upon Petitioner's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, filed May 3, 2004 (documents # 1); and on the Government's Answer and de facto motion for summary judgment, filed October 13, 2004 (document #9). After having carefully considered the foregoing pleadings along with Petitioner's responses to the Government's motion for summary judgment (filed November 1 and 22, 2004 as document ## 12 and 13), the Court has determined that Petitioner has established that his appellate counsel was defi-cient for having failed timely to advise him both of the denial of his direct appeal and his right to seek further review. Therefore, Petitioner is entitled to the limited remedy of moving the Fourth Circuit Court of Appeals to reenter its final Judgment so that he can consider whether or not to seek certiorari review in the U.S. Supreme Court.

However, consistent with the controlling precedent in this Circuit, this Court also has reviewed Petitioner's other claims and determined that he has failed to establish an entitlement to relief on his remaining claims against his former attorneys. Therefore, Petitioner's Motion to Vacate will be <u>granted</u> in part and <u>denied</u> in part as hereafter explained in greater detail.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On November 6, 2000, a Bill of Indictment was filed charging Petitioner and three others with having conspired to possess with intent to distribute five kilograms or more of cocaine powder and 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841 and 846 (Count One)(Case 5:00CR46, document # 3).[1]  The conspiracy allegedly operated from 1991 up until the time that the Indictment was filed in 2000.

On April 25, 2001, one of Petitioner's co-defendant/co-conspirator's, Robert Mott, filed a Plea Agreement by which he agreed to plead guilty to the conspiracy charge (Case 5:00CR46, document # 45).  On May 16, 2001, Mott appeared before the Court and entered his guilty plea.  In the meantime, on May 8, 2001, Petitioner and his two remaining co-defendants/co-conspirators

---

[1]In addition, co-defendant Robert Mott was charged with having been a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Two); and co-defendants Byron Lattimore and William Eckles were charged with having possessed firearms during and in relation to drug trafficking offenses, in violation of 18 U.S.C. § (924(c)(1) (Counts Three and Four, respectively). However, Mott's plea agreement provided for the dismissal of his gun charge, and the Court subsequently granted the Government's motion to dismiss the gun charges against Lattimore and Eckles before those matters were submitted to the jury.

opted for a trial jury.

Also on May 8, 2001, Petitioner's attorney filed a document captioned as a "Motion For Leave To Late-File" seeking permission to file an out-of-time motion to suppress on the ground that he just had discovered the basis for seeking the suppression of the drug evidence which was obtained from Petitioner's vehicle during a traffic stop in Glynn County, Georgia. (Case 5:00CR-46, document # 70). Counsel also filed the subject Motion to Suppress, asserting that a December 1997 vehicle search which yielded packages of cocaine powder was conducted without Petitioner's consent or any other legal authority. (Case 5:00CR46, document # 71).

The Court noted that the Motion should have been made sooner; however, out of an abundance of caution, it decided to entertain the Motion. (Trial Tr., filed Jan. 4, 2002, 9). Nevertheless, the Court rescheduled that Motion to be heard during the trial due to counsel's tardy arrival on the morning it originally was scheduled to be heard.

Once the Motion hearing commenced on voir dire, the Government presented the testimony of **Officer Mike Owens** of the Glynn County Police Department in Georgia. (Trial Tr. 370). Officer Owens testified that on December 31, 1997, he was patrolling Interstate 95 when he observed Petitioner's vehicle veer onto the shoulder. (Trial Tr. 371). Consequently, Owens stopped the car,

reviewed Petitioner's license and had him perform a sobriety test, which Petitioner passed.  (Trial Tr. 372-73).

Officer Owens also engaged Petitioner in a conversation during which Petitioner denied that he had been drinking, but explained that he was tired from having driven his girlfriend (Angela Humes), who was with him, to visit her family in Georgia. (Trial Tr. 373).  However, when Officer Owens went to Petitioner's car to retrieve his registration and insurance documents Ms. Humes told Owens that she and Petitioner were returning from Miami and Orlando, Florida.  (Trial Tr. 373-74).  Officer Owens wrote Petitioner a warning ticket, told him he was free to leave and asked if he had any drugs, money or weapons in his car. (Trial Tr. 374).  Owens testified that Petitioner hesitated, but then denied having had any of those items in his car; and that Petitioner granted his request for permission to search the car. (Trial Tr. 374-76).

On cross-examination, Officer Owens stated that his car did not have recording equipment in 1997; that Petitioner had not appeared to be nervous during their encounter; that his suspicions were aroused by the inconsistencies between Petitioner and Humes' statements and by certain of Petitioner's answers which did not appear to make sense; and that he called for back-up officers because he suspected that Petitioner may have been involved with drugs. (Trial Tr. 377-81).  Owens also stated that

by the time Petitioner consented to the search, a K-9 officer had arrived, at which point Owens advised that the dog would be used for an initial perimeter search in order to save time. (Trial Tr. 384). However, once the dog alerted the officers to the presence of narcotics in the car, a full search revealed two packages of cocaine powder inside two separate interior panels. (Trial Tr. 385-89).

At the conclusion of that testimony, the Court found that the Government presented credible evidence to establish that Owens properly had stopped Petitioner's car and that Petitioner voluntarily had consented to the search (Trial Tr. 400). Accordingly, the Court denied Petitioner's Motion to Suppress and agreed to permit the admission of the foregoing testimony. (Trial Tr. 400). In due course, the Government called Officer Owens and presented that testimony to the jury. (Trial Tr. 401-16).

Relevant to Petitioner's conviction, the Government also presented testimony from **Paul Bines** who stated that he had known Petitioner for 10 or more years; that at some point in 1997, he approached Petitioner at Petitioner's auto shop and asked if he had cocaine to sell; that he had approached Petitioner because he had heard about Petitioner's drug-related activities; that on the first occasion, Petitioner sold Bines four ounces of cocaine base for $4,000 dollars; that he made numerous additional four-ounce

cocaine base purchases totaling approximately 18 to 20 ounces;
that for a period of time, he stopped purchasing from Petitioner
due to Petitioner's arrest; that during the time that Petitioner
was unavailable, Bines purchased varying amounts of cocaine base
from Petitioner's co-defendants; that he resumed purchasing co-
caine base from Petitioner in or around the summer of 1998,
making no more than four purchases of three-ounce packages from
Petitioner; that a couple of those purchases involved cocaine
which Petitioner advised had been tainted with diesel fuel; and
that Bines stopped trafficking in drugs when Bines got arrested
in September 1998.  (Trial Tr. 31-45).

On cross-examination, Bines conceded that he is a convicted
felon; that he had failed to give all of the foregoing informa-
tion to investigators during his debriefings; that his memory was
better during his 1998 debriefings than at trial; and that he was
cooperating and testifying in hope of receiving a reduced sen-
tence.  (Trial Tr. 51-72).

**Terry Barringer** testified that he had known Petitioner since
the 1970s, and had begun buying cocaine base from him in the sum-
mer of 1997; that he initially bought two ounces of cocaine base
from Petitioner and continued to buy two-ounce packages from him
about twice per week for a two-month period; (Trial Tr. 84-89).

On cross-examination, Barringer admitted that he then was
serving a prison sentence for a drug-related conviction; that

Petitioner was not a party to the drug conspiracy for which he was convicted; that he was on parole during the time that he was purchasing drugs from Petitioner; and that he had agreed to cooperate with the Government out of the goodness of his heart. (Trial Tr. 97-107).

The Government also called several law enforcement witnesses to testify. **Deputy Sheriff Clarence Harris** of the Iredell County Sheriff's Office testified that he used a confidential informant to secure information about the subject conspiracy; that in December 1997, his informant told him that Petitioner was a known drug supplier in the Statesville, North Carolina area; and that on December 19, 1997, Harris used an undercover officer from another police department (Larry Welch) to purchase 14 grams of cocaine base from Petitioner. (Trial Tr. 119-26). However, Deputy Harris admitted that he did not personally observe the sale as it was conducted, and he did not attempt to obtain fingerprint evidence from the packages. (Trial Tr. 142-43).

**Officer Larry Welch** of the Concord, North Carolina Police Department testified that on December 19, 1997, while working undercover, he accompanied an informant to Petitioner's business where a 13.9-gram package of cocaine base was purchased from Petitioner; that on the occasion of the transaction, he wore a monitoring device; that he and Petitioner directly discussed the price for the 13.9-gram package; and that he also discussed the

purchase of an "egg," that is, an ounce-sized package, with Peti-
tioner, during which conversation Petitioner declined to lower
his $1,100 per ounce price because he said his cocaine was a
higher quality than other dealers' drugs.  (Trial Tr. 159-64).
On cross-examination, Welch stated that he had no knowledge of
Petitioner before the transaction took place.  (Trial Tr. 167).

Former Statesville Police Officer **David Woodward** testified
that in June 1998, an informant (Victor Hairston), wore a record-
ing device, went to Petitioner's auto shop, paid him $100 for an
earlier cocaine base debt, and purchased an additional quarter
ounce of powder cocaine.  (Trial Tr. 184-88).  Woodward further
told the jury that on the following day, the informant and an
undercover officer from the Salisbury Police Department (Michael
Dummett) returned to Petitioner's auto shop and negotiated the
purchase of two ounces of cocaine from Petitioner. (Tr. at 184-
196).  Woodward also authenticated the packages of drugs which
were obtained from Petitioner and the tapes which were made on
the above-referenced occasions.  (Trial Tr. 190-195).

On cross-examination, Woodward told the jury that after the
second sale was negotiated with Petitioner, a third party deli-
vered the two bags of powder cocaine; that no fingerprint analy-
ses were performed on the packages; and that Hairston was
cooperating with authorities in order to help his own legal
situation; (Trial Tr. 208-214).

The undercover police officer, **Lieutenant Mike Dummett**, testified that he was present during the two-ounce negotiation between Hairston and Petitioner at Petitioner's auto shop; that he heard Petitioner inquire about whether it was okay to make the transaction in his (the officer's) presence before Petitioner and Hairston began discussing the transaction; that Petitioner advised that although the cocaine smelled like fuel, it still was usable; that after the negotiation was concluded, Hairston called Petitioner and was told that Petitioner would have someone meet them to consummate the deal; that a man then met them at Petitioner's home and directed them to another location where the two-ounce deal was completed for $1,860; and that the cocaine smelled like some type of fuel, just as Petitioner had described. (Tr. 226-47 and 252).

**Victor Hairston**, the informant, testified that he had never been convicted of any crime; that his stepfather is Petitioner's cousin; that in early June 1998, he owed Petitioner $100 for an earlier cocaine purchase; that on June 10, 1998, he wore a recording device, went to Petitioner's auto shop and paid him the $100; that Petitioner then gave Hairston three additional grams of cocaine, which cocaine Petitioner described as smelling like kerosene; that Petitioner also told Hairston that he wanted to sell an additional three ounces of the kerosene-smelling cocaine at a discounted price of $900 per ounce; that on the following

day, Hairston and an undercover officer returned to buy the co-
caine from Petitioner; and that Petitioner directed Hairston and
the officer to Petitioner's home and then to a convenience store
where they completed the deal. (Trial Tr. 260-82). Hairston also
authenticated the recordings and corresponding transcripts of two
of the conversations which he recorded with Petitioner in June
1998. (Trial Tr. at 283-85).

On cross-examination, Hairston stated that his $100 payment
was for drugs which he had not directly received from Petitioner;
that he and Petitioner never had discussed drugs prior to the oc-
casion when Hairston paid him the $100; that Hairston's reason
for approaching Petitioner was to see whether he would show
interest in selling drugs; that Hairston was the one who brought
up the possibility of the additional three-ounce purchase; and
Hairston clarified that the three-ounce sale was consummated with
a third party who was the one who actually directed them to the
location at which the deal was consummated. (Trial Tr. 304-320).

**Robert Mott,** Petitioner's co-defendant/co-conspirator tes-
tified that he knew Petitioner for 15 to 20 years; that the two
were in the drug business together from about 1996 through 1998;
that after Mott had made several trips to Florida to pick up ki-
logram-sized packages of powder cocaine from a Jamaican named
"George," Mott and five of his other drug associates hired Peti-
tioner to make the Florida trips for them; that after making

three or four trips to Florida, Petitioner also became a member
of Mott's sale/distribution network; that Petitioner stopped
making trips to Florida after the 1997 Glynn County drug arrest;
and that Petitioner had picked up a total of about five kilograms
of powder cocaine from his Florida trips (Trial Tr. 329-40).
Mott also stated that he generally conducted his deals with Peti-
tioner at Petitioner's auto shop, but they also occasionally met
at Petitioner's home.  (Trial Tr. 343-44).

On cross-examination, Mott stated that he was testifying
pursuant to a plea agreement with the Government; that he negoti-
ated his sentencing exposure down from a life term to a term of
ten years up to life imprisonment; and that he previously had
been convicted of drug charges on two occasions. (Trial Tr. 347-
51).  Mott also stated that Petitioner sold cars from his auto
shop; and he admitted that he had failed to mention any drug
deals with Petitioner during his initial debriefing with the
Government.  (Trial Tr. 353-55).

**Sergeant Terry Wright** of the Glynn County, Georgia Police
Department testified that he was present during the December 1997
interstate search and arrest of Petitioner by Officer Owens; and
that the two packages of cocaine which they retrieved weighed
approximately two kilograms.  (Tr. 417-22).

**Special Agent Fred Denson** of the Georgia Bureau of Investi-
gations testified that in December 1997, he assisted officers

from the Glynn County Police Department with their investigation of Petitioner; that he was present when the two packages of cocaine were taken from Petitioner's vehicle; and that field tests showed that packages contained 4.9 pounds (over two kilograms) of cocaine. (Trial Tr. 422-26). On cross-examination, Denson stated that Petitioner was charged but not prosecuted for the Georgia offense because Georgia deferred to the instant federal prosecution. (Trial Tr. 427).

**William Stevenson** testified that he then was serving a federal sentence for a drug conspiracy conviction; that he is a distant cousin of Petitioner's; that during the early 1990s, Stevenson sold cocaine to Petitioner for Petitioner's personal use; that in the mid-1990s, Petitioner had a "complete turn around" and Petitioner and one of his co-defendants became well-connected drug dealers; and that in about 1996, Stevenson bought two ounces of cocaine base from Petitioner when Stevenson was unable to get the drugs from his regular supplier. (Trial Tr. 465-67).

On cross-examination, Stevenson indicated that Petitioner was not a part of the conspiracy with which he (Stevenson) operated; that he was testifying pursuant to his cooperation agreement with the Government; and that he could not recall whether he mentioned his transaction with Petitioner during his first debriefing by authorities. (Trial Tr. 470-71 and 483).

**Isaiah Mayfield** testified that he then was serving a federal sentence for a drug conspiracy conviction; and that he initially became acquainted with Petitioner through his car detailing work. (Trial Tr. 504-06).  On cross-examination, Mayfield stated that he never had directly dealt with Petitioner, but had purchased cocaine base from Petitioner's subordinate; that he previously had told authorities about how he had heard Petitioner talking about his pre-trial release from following his Georgia arrest; and that he had entered into a plea agreement with the Government.  (Trial Tr. 521, 524 and 530).

The Government presented additional evidence against Petitioner's co-defendants, and at the close of that presentation, Petitioner and his co-defendants sought a judgment of acquittal. (Trial Tr. 621-24).  Counsel for Petitioner argued that the Government merely had shown individual drug sales but had not made a prima facie case showing that Petitioner was a part of an agreement to traffic in drugs.  (Trial Tr. 624-25).  However, after viewing the evidence in the light most favorable to the Government, the Court determined that the defendants' motions had to be denied.  (Trial Tr. 626).

Petitioner and one of his co-defendants declined to present their own evidence.  (Trial Tr. 634).  However, Petitioner's other co-defendant, **William Eckles,** testified in his own defense. Eckles denied being a part of a conspiracy, claimed that the

Government's witnesses were lying, and told the jury that he knew of Petitioner but had no relationship with him. (Trial Tr. 638).

At the close of all of the evidence, the jury convicted Petitioner and his two co-defendants of conspiring to posses 50 grams or more of cocaine base and five kilograms or more of powder cocaine. (Case 5:00CR46, document ## 74-76: Jury Verdicts).

On September 7, 2001, Petitioner filed a pro-se letter-motion asking the Court to remove trial counsel from his case. (Case 5:00CR45, document #107). On September 24, 2001, Petitioner's attorney filed a Motion to withdraw as counsel and requested the appointment of new counsel. (Case 5:00CR45, document # 112). After the Court made an inquiry into the status of counsel it orally granted counsel's motion to withdraw. Thereafter, new counsel was appointed for Petitioner.

On February 11, 2002, the Court held Petitioner's Sentencing Hearing. On that occasion, defense counsel objected to the Pre-Sentence Report's recommendation that Petitioner's calculations (totaling the marijuana equivalent of 7,387 kilograms) include nine ounces of cocaine base which was attributed to Petitioner based upon a sale he made to Leonard Holland, an individual who had not testified at trial. (Sent'g. Tr. 6-7). In response, the Probation Officer advised that she had used information from the case agent and the Government's files conservatively to estimate Petitioner's sentencing exposure. (Sent'g. Tr. 7). The Court

14

overruled Petitioner's objection finding that the evidence was supported by a preponderance of the evidence. (Sent'g. Tr. 6, 8). The Court also overruled Petitioner's pro-se objection that he had not had sufficient time to review his Pre-Sentence Report with his new attorney. (Sent'g. Tr. 8). Thereafter, the Court adopted the Report's calculations reflecting that Petitioner's Offense Level was 34, his Criminal History Category was III and his resulting range of imprisonment was 188 to 235 months. (Sent'g. Tr. 8-9).

Next, defense counsel argued that Petitioner was a 49-year-old who had gotten involved in drug trafficking because of his own untreated drug dependancy; therefore, counsel asked for a sentence at the low end of the applicable range. (Sent'g. Tr. 9). For his part, Petitioner told the Court that he had been a drug user for about 12 years, but also had tried to raise two children as a single parent; that he felt as if his life was being taken away from him; and that he completely had turned his life around by giving his life to Christ and getting married. (Sent'g. Tr. 9-10). In addition, however, Petitioner told the Court that he did not believe he had received a fair trial, though he failed to elaborate on that belief. (Sent'g. Tr. 10). At the conclusion of his remarks, Petitioner placed himself on "the mercy of [the judge] and on [his] God." (Sent'g. Tr. 10).

Upon considering the foregoing, the Court sentenced

15

Petitioner to the lowest possible term of 188 months imprison-
ment. (Sent'g. Tr. 100). Petitioner timely gave notice of his
appeal to the Fourth Circuit Court of Appeals. (Case 5:00CR, do-
cument # 83).

After securing the appointment of yet another attorney, on
appeal Petitioner argued that: (1) the prosecutor's use of a
chart -- with arrows connecting him and his co-defendants to
various trial witnesses –- during her rebuttal closing statement
was improper and warranted a new trial; (2) four separate juror
irregularities, cumulatively, warranted a new trial; (3) this
Court erred in denying his motion to suppress; (4) the evidence
was insufficient to support his conviction; and (5) this Court's
calculation of the drug quantities attributable to him was erro-
neous. See United States v. Waddell, 62 Fed. App'x 491 (4th Cir.
April 11, 2003) (unpub.).

However, the Circuit Court determined, in light of this
Court's proper instructions concerning the chart's limited value,
that Petitioner could not establish that he was unfairly preju-
diced by the prosecutor's use of that prop during her rebuttal
argument. Id. at 495-96. Furthermore, the appellate Court deter-
mined that this Court had "acted appropriately . . ." and had not
abused its discretion in handling the juror irregularities. Id.
at 496. Moreover, the Circuit Court determined that this Court
did not err in denying Petitioner's motion to suppress because

16

the totality of the evidence supported the Court's conclusion that Petitioner voluntarily had consented to the subject search. Id. at 496-97. Similarly, the Circuit Court found, notwithstanding that some of the testimony came from convicted drug dealers and Government informants, that the evidence was sufficient to support Petitioner's conspiracy conviction. Id. at 497.

Last, the appellate Court rejected Petitioner's challenge to his sentence, noting that the subject calculations properly were based upon information set forth in Petitioner's Pre-Sentence Report along with the relevant testimony presented during his trial. Id. at 498. Consequently, Petitioner's conviction and sentence were affirmed. Id.

Petitioner returned to this Court on the instant form-Motion to Vacate (document # 1). By that Motion, Petitioner alleges that he was subjected to numerous instances of ineffective assistance of trial, sentencing and appellate counsel. However, prior to the filing of the Government's response, Petitioner amended his Motion to Vacate to delete one of his claims against sentencing counsel (document # 5, 1).

However, the Motion to Amend also included two claims that Petitioner's sentence was imposed in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000) and its progeny, Blakely v. Washington, 542 U.S. 296 (2004); and that he was subjected to a tainted jury by two separate juror irregularities.

In response to Petitioner's allegations, the Government
filed a lengthy Answer along with affidavits from each of Peti-
tioner's former attorneys, contending both that Petitioner cannot
establish either a deficiency or resulting prejudice; and that he
otherwise has failed to establish an entitlement to relief on his
Motion.  In reply and response, Petitioner filed a Traverse and
his own Response seeking to rebut the Government's arguments.

## II.  **ANALYSIS**

### 1.  **Petitioner's claim under Apprendi and Blakely are not cognizable in this pro-ceeding**.

Taking his claims out of turn, by his amendment, Petitioner
argues that his sentence was imposed in violation of the rules
announced in Apprendi and Blakely.  However, in United States v.
Sanders, 247 F.3d 139, 147-48 (4th Cir. 2001), the Fourth Circuit
Court of Appeals first held that the rules announced in Apprendi
are not retroactively applicable in collateral proceedings like
the instant one.  Further, since the time that Sanders was decid-
ed, the Fourth Circuit has held that the rules announced in
Blakely and its progeny, United States v. Booker, 543 U.S. 220
(2005), also cannot retroactively be applied in collateral pro-
ceedings.  United States v. Morris, 429 F.3d 65, 72 (4th Cir.
2005).  Not surprisingly, the Circuit Court consistently has ad-
hered those holdings.  See United States v. Marshall, 117 Fed.
App'x 269, 270 (4th Cir. Dec. 22, 2004) (rejecting Blakely claim

18

on the ground that the Supreme Court had not made <u>Blakely</u> applicable to cases on collateral review); <u>United States v. Francis</u>, 29 Fed. App'x 128, 130 (4th Cir. Jan. 23, 2002) (vacating sentence reduction imposed after §2255 motion was granted on <u>Apprendi</u> claim, finding that district court's order "squarely conflict-[ed] with <u>Sanders</u>."); <u>Harrison v. United States</u>, 28 Fed. App'x 311 (4th Cir. Feb. 8, 2002) (dismissing appeal of the denial of § 2255 motion, noting that <u>Sanders</u> decision precluded relief on <u>Apprendi</u> claims); <u>and</u> <u>United States v. Clarkson</u>, 8 Fed. App'x 240 (4th Cir. May 4, 2001) (same).

Accordingly, inasmuch as Petitioner is seeking retroactive application of <u>Apprendi</u> and <u>Blakely</u> in this collateral proceeding, his claim of sentencing error must summarily be rejected.

**2.** **Petitioner's claim that he was subjected to a tainted jury by virtue of a juror's exposure to a newspaper article is procedurally barred**.

Petitioner's amendment also alleges that he was subjected to a tainted jury, in part[2] by virtue of a juror's inadvertent exposure to a newspaper article about his case. Therefore, Petitioner claims he is entitled to a new trial. However, Petitioner's direct appeal raised this issue in the context of his claim that

_____

[2]Petitioner also claims that the jury was tainted by a juror's untimely revelation that he recognized one or more of the defendants from having seen them at a Wal-Mart where he held a part-time job. However, because Petitioner also alleges that trial counsel was ineffective for having failed to seek a mistrial on that basis, the Court has chosen to address this claim in the context of its discussion of counsel's performance.

19

this Court had erred in its handling of this and three other juror irregularities.  See Waddell, 62 Fed. App'x at 496. On that occasion, the Court of Appeals flatly rejected the contention asserting that this Court had "acted appropriately and the appellants' argument is without merit."  Id.

The law is well settled that in the absence of a favorable, intervening change in the law which can be applied on collateral review, a petitioner simply is not free to re-litigate claims which already were rejected on direct review.  Davis v. United States, 417 U.S. 333, 342 (1974); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976).  Accordingly, inasmuch as Petitioner merely is seeking to revisit the same juror irregularity issue that was rejected on direct appeal without directing the Court to any intervening change in law which authorizes him to do so, this claim procedurally is barred.

### 3.  All but one of Petitioner's claims against his former attorneys are belied by the record.

With respect to allegations of ineffective assistance of counsel, a petitioner must show that counsel's performance was constitutionally deficient to the extent it fell below an objective standard of reasonableness, and that he was prejudiced thereby.  Strickland v. Washington, 466 U.S. 668, 687-91 (1984). In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Id. at 689; see also Fields v. Attorney

Gen'l. of Md., 956 F.2d 1290, 1297-99 (4th Cir. 1985); Hutchins v. Garrison, 724 F.2d 1425, 1430-31 (4th Cir. 1983); and Marzullo v. Maryland, 561 F.2d 540 (4th Cir. 1977).

Furthermore, in considering the prejudice prong of the analysis, the Court must not grant relief solely because a petitioner can show that, but for counsel's performance, the outcome of the proceeding would have been different.  Sexton v. French, 163 F.3d 874, 882 (4ᵗʰ Cir. 1998).  Rather, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Id., quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

To put it another way, in order to demonstrate prejudice, a petitioner must show a probability that the alleged errors worked to his "actual and substantial disadvantage, infecting his trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986), citing United States v. Frady, 456 U.S. 152, 170 (1982).  Under these circumstances, then, the petitioner "bears the burden of proving Strickland prejudice." Fields, 956 F.2d at 1297, citing Hutchins, 724 F.2d at 1430-31.  Therefore, if the petitioner fails to meet this burden, a "reviewing court need not consider the performance prong." Fields, 956 F.2d at 1290, citing Strickland, 466 U.S. at 697.

## A.  Trial Counsel

Petitioner claims that trial counsel was ineffective for

having failed to subject the Government's case to meaningful, adversarial testing by exposing all of the inconsistencies between Paul Bines and Robert Mott's trial testimony and their out-of-court statements to authorities. However, Petitioner subsequently conceded that counsel did "question Bines regarding the inconsistencies between what he said in Court and what he had told Police . . . . [and] "at least showed reasonable doubt as to why any competent observers should believe Bines testimony. . . " (document # 3, Petr.'s Supp. Memo. 3-4).

Furthermore, the Court's review of the record reveals that counsel's cross-examination also revealed inconsistencies between Mott's testimony and his pre-trial, unsworn statements to authorities. Indeed, the record shows that counsel questions established: (1) that both Bines and Mott were testifying pursuant to plea or other agreements by which they hoped to earn reduced sentences for themselves, thereby giving them motive to fabricate their testimony; (2) that both were convicted felons, further eroding their veracity; and (3) that Bines was having difficulty recalling the particulars of the events about which he was testifying. However, Petitioner apparently ignores the fact that much of the damning testimony which was given by Bines, Mott and the other non-law enforcement witnesses largely was corroborated by other evidence, including the testimony of several law enforcement witnesses whose testimony simply was not vulnerable to

serious attack. Thus, on this record, Petitioner cannot show either deficient performance or prejudice on this claim.

Petitioner also alleges that trial counsel failed to protect him from the improper, prejudicial remarks of the prosecutor which were made during closing argument. Specifically, Petitioner claims that the prosecutor improperly vouched for Mott's credibility when: (1) she reminded the jury of the law enforcement testimony about the 1997 Georgia incident, and asserted that the officer's testimony "support[ed] what [the jury] heard from Robert Mott" and told them that "Robert Mott is believable"; (2) she asserted several times that the testimony given by various other witnesses about Petitioner and his co-defendant/co-conspirators was consistent with Mott's testimony; and (3) she referred to Mott's guilty plea.

In <u>United States v. Lewis</u>, 10 F.3d 1086, 1089 (4th Cir. 1993), the Fourth Circuit explained that:

> Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness. Consequently, the prosecutor may not, among other things, make explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony.

Applying the foregoing to the instant case, it is clear that no such vouching took place.

First, the prosecutor never told the jury of her personal

beliefs, made personal assurances, or otherwise suggested that Mott was believable based upon evidence which had not been presented in court. Second, the Court's instructions concerning the evidence advised the jury that it had the duty of determining the facts based solely upon the testimony of the witnesses, and the evidence properly admitted in their presence. (Trial Tr., Vol. V 659). Those instructions also made it clear that the jury had the sole responsibility of determining the credibility of the witnesses, and they explained the factors which were to be weighed in making that determination (Trial Tr., Vol. V 664). Third, the law is clear that the prosecutor was free to present the details of Mott's plea agreement, including his promise to give truthful testimony. <u>United States v. Henderson</u>, 717 F.2d 135, 138 (4th Cir. 1983). Thus, in light of the foregoing, Petitioner's claim of vouching is factually and legally baseless.

Petitioner also claims that trial counsel failed to protect his right to confront three persons, Leonard Holland, Angela Humes and Freddie Joyner, who were not called as witnesses, but whose out-of-court statements supposedly were used against him. However, Petitioner does not even bother to specify what favorable, unimpeachable testimony he believes Holland and Joyner would have provided for him. Nevertheless, this Court conducted its own review and determined that even if he could have given favorable testimony for Petitioner, on cross-examination Joyner would

have been forced to admit a 52-gram cocaine sale which other witnesses already had told the jury that Joyner completed at Petitioner's direction.  Similarly, Holland would have been cross-examined about the other witnesses' testimony concerning his involvement in multiple drug transactions with Petitioner and certain of Petitioner's co-defendant/co-conspirators.

As to Ms. Humes, Petitioner provides two reports of interview which reflect that she was a confidential informant for the Government who abused crack and worked as a book keeper at Petitioner's auto body shop (document # 3, Petr's Supp. Memo, exh. D-1).  Humes further reported that she did not record any of the Petitioner's two to five thousand dollar business transactions in his company records nor deposited them into any bank account; that Petitioner kept the money from those transactions in a broken-down vehicle; that Petitioner made about $350.00 per week at his shop; that she accompanied Petitioner on a trip to Florida for the sale of a vehicle; and that the Florida sale was not completed.

On the other hand, such reports reflect that had Humes  been called by trial counsel to testify, she also would have given damaging testimony against him on cross-examination.  Indeed, Humes would have had to admit that her interviews included her statements that during the time she worked for Petitioner, he made her leave when certain persons came by the shop; she heard

several subjects discuss ordering more drugs from Petitioner; she observed numerous people give money to Petitioner at the shop; during the Florida trip, Humes and Petitioner met up with another man and woman who followed them around Florida in a separate car; the four went to several different houses in Jacksonville; the four also drove to Miami where they spent time placing telephone calls from a motel; they subsequently drove to a house in Orlando where Petitioner was told by a different woman that "it's in the car"; the woman with whom they had been traveling gave Petitioner a tube of toothpaste which he spread onto three or four brick-like packages inside a bucket; Petitioner took the bucket of packages to the front of the car and began to work under its hood; and she and Petitioner then proceeded to return to North Carolina, but were stopped and arrested for drugs in Georgia.

Based upon the foregoing, then, Petitioner cannot show that trial counsel's tactical decision not to call these persons as witnesses either was deficient or prejudicial. On the contrary, this record is sufficient to support a conclusion that counsel reasonably could have found that such witnesses' testimony was more harmful than beneficial to Petitioner.

Petitioner also contends that trial counsel was ineffective for his failure to seek a mistrial on the ground that the jury was tainted by Juror Nine. In particular, Petitioner contends that counsel should have sought a mistrial when Juror Nine

belatedly disclosed that he recognized one or more of the defendants.

Whether to grant a motion for mistrial is left to the broad discretion of the trial court.  See, e.g., United States v. Dorlouis, 107 F.3d 248, 257 (4th Cir. 1997) ("denial of a defendant's motion for mistrial is within the sound discretion of the district court and will be disturbed only under the most extraordinary of circumstances"); United States v. Smith, 44 F.3d 1259, 1267 (4th Cir. 1995) (same).  Moreover, "[i]n the instance of a biased juror, that juror can be dismissed and replaced with an alternate juror."  United States v. Hayden, 85 F.3d 153, 157 (4th Cir. 1996) (internal quotations and citations omitted) (affirming denial of mistrial after sole African-American juror advised the trial court he knew a witness and was removed from jury).  Accord United States v. Thompson, 744 F.2d 1065, 1068 (4th Cir. 1984).

This Court's review of the transcript along with the records of Susan Hankins, the Deputy Clerk of Court who assisted the undersigned with this trial, reflects that on May 14, 2001, the jury retired to begin deliberating at 3:59 p.m. but at 4:05 p.m., Juror Nine sent the Court a note, which note caused the Court immediately to halt those deliberations.  The subject note advised the Court that:  Juror Nine recognized one or more of the defendants but did not know them; that he believed that he had

seen two of them at a Wal-Mart store where he worked; that he believed that two of the defendants recognized him; and that he was concerned about retaliation. (Jury Delib. Tr. 4-5).

At 4:18 p.m. the attorneys were assembled to discuss the matter. (Jury Delib. Tr. 5). After that discussion, the attorneys agreed to have Juror Nine questioned about whether he had written the note and stood by its assertions. (Jury Delib. Tr. 5-6). In the event he did, the attorneys agreed to have Juror Nine excused, and to poll the remaining jurors to determine whether they also were tainted by the note. Notably, however, Petitioner's counsel further expressly reserved his right to seek a mistrial in the event that the results of that inquiry warranted such action. (Jury Delib. Tr. 6-7).

Upon questioning, Juror Nine advised that he was at lunch that day when he realized that he recognized the defendants. (Jury Delib. Tr. 7). Juror Nine further reiterated the contents of his note and apologized for not having sooner informed the Court of that matter. (Jury Delib. Tr. 7-8). Consistent with the attorneys' agreement, the Court excused Juror Nine and called the remaining jurors into the courtroom for questioning about the note. (Jury Delib. Tr. 8). In response to the question, the other jurors all indicated that they had not discussed the note with Juror Nine. (Jury Delib. Tr. 11). Thus, after the attorneys declined the opportunity to further question the jury, Juror

Nine was replaced by an alternate, and then the Court then instructed the jury to begin anew its deliberations. (Jury Delib. Tr. 11-12). The jury deliberated for an additional 23 minutes until it asked to be released for the evening. (Jury Delib. Tr. 13). On the following day, the jury resumed its deliberations at 9:00 a.m and reached its guilty verdicts at 10:32 a.m., for a total of approximately 1:55 minutes of deliberations. (Jury Delib. Tr. 16-17).

The foregoing refutes Petitioner's claim that trial counsel should have sought a mistrial. Petitioner does not even attempt to articulate how he believes the entire jury was tainted by Juror Nine, nor has this Court discovered any evidence in the record to support such a conclusion. Rather, the record reflects that only Juror Nine was tainted by his knowledge of the defendants and possible fear of them; and that his removal from service remedied that taint. Consequently, on this record the Court concludes that counsel was not ineffective for not having moved for a mistrial, which motion, in this Court's opinion, would have been found to be meritless.

### B.  Sentencing Counsel

As to sentencing counsel, Petitioner first contends that she failed to spend more than 67 minutes reviewing his Pre-Sentence Report with him. However, this Court fully addressed and rejected this issue during Petitioner's Sentencing Hearing.

Indeed, on the occasion of that Hearing, Petitioner claimed that he and counsel had not sat down and talked about the Report. (Sent'g. Tr. 3). For her part, counsel reported that she twice had met with Petitioner at the County Jail, she had spoken to him by telephone on several occasions, and she had met with him in the Marshal's holding cell prior to the Hearing. (Sent'g. Tr. 5). Nevertheless, Petitioner further advised the Court that his chief complaint about counsel and his Pre-Sentence Report had to do with his objection to the drug quantities attributed to him by Leonard Holland. (Sent'g. Tr. 6). However, counsel advised that she thoroughly had reviewed Petitioner's Report, and had filed objections to the Report based upon her conversations with him. (Sent'g. Tr. 5). In addition, the Probation Officer explained the source of her calculations. (Sent'g. Tr. 7).

At that point, the Court determined that the amounts which Petitioner was challenging were established by trial testimony and the case report; and that such quantities, in the aggregate, were sufficient to support the Report's calculations. (Sent'g. Tr. 6, 8). Therefore, the Court concluded that Petitioner had been given sufficient time to review his Report with counsel and overruled the objection to the calculations. (Sent'g. Tr. 8).

Despite the fact that Petitioner is attempting to rehash his earlier claim of insufficient time, he has failed to point to any additional matters which he believes counsel would have been able

to raise had she spent more time with him.  Moreover, the record
is clear, as Petitioner concedes, that even if the Court had used
the 7,302 kilogram marijuana equivalent quantity instead of the
7,387 amount which it actually used <u>or</u> the 7,988 kilogram quan-
tity which Petitioner erroneously contends was used, his sentence
would not have changed because the offense level and correspond-
ing sentencing range for all three quantities was exactly the
same.  Simply put, even if this claim could be re-litigated,
Petitioner would not be able to show either a deficiency or a
prejudicial result on the basis of his attorney's handling of his
Pre-Sentence Report.

Petitioner also claims that sentencing counsel failed to
protect his right to confront his accusers at sentencing.  How-
ever, the crux of this claim already has been rejected on direct
appeal.

Indeed, on appeal Petitioner argued that his sentence was
erroneously calculated.  However, the appellate Court observed
that "[i]n calculating drug amounts, the [district] court may
consider any relevant information, provided that the information
has sufficient indicia of reliability to support its probable
accuracy. . . . Even hearsay alone can provide sufficiently re-
liable evidence of drug quantity."  <u>Waddell</u>, 62 Fed. App'x at
498.  Furthermore, the appellate Court stated that it was permis-
sible for this Court to "approximate the amount of drugs, erring

31

on the side of caution." Id. On those bases, therefore, the appellate Court concluded that this Court had not abused its broad discretion, and its sentencing calculations were not erroneous. Id. Thus, because Petitioner's sentence was correctly calculated, he cannot establish that counsel was ineffective for having chosen not to secure the three persons as sentencing witnesses.

Furthermore, it has not escaped the Court's attention that this claim is also factually erroneous. That is, the 1,676 grams of cocaine which Petitioner seeks to connect to Ms. Humes actually was the subject of the Georgia officers' testimony; and the 52 grams of cocaine which Petitioner seeks to link to Mr. Joyner was the subject of the North Carolina officers and an informant's testimony. And, while the nine ounces of cocaine base which were linked to Mr. Holland were not the subject of any trial testimony, the appellate Court approved of its inclusion as having been established from the case file by a preponderance of the evidence. In sum, therefore, even if Petitioner's claim were not foreclosed by the Circuit Court's prior rejection of it, he still could not show that counsel was deficient in this regard.

Petitioner also claims that sentencing counsel failed to argue against the disparity in punishment between crack and powder cocaine offenses. However, in 2002 when Petitioner was sentenced, the Fourth Circuit repeatedly was upholding the 100:1

variation between crack and powder cocaine sentences imposed by Congress under the relevant statutes.  See, e.g., United States v. Burgos, 94 F.3d 849, 876-77 (4th Cir. 1996) (en banc); United States v. Fisher, 58 F.3d 96, 99-100 (4th Cir. 1995).  In fact, even as late as 2006 in United States v. Eura, 440 F.3d 625, 633 (4th Cir. 2006), the Fourth Circuit reversed a district court's post-Booker attempt to vary downward from the Guidelines' advisory sentencing range to impose a lower term based upon the subject disparity.

Indeed, it was not until the Supreme Court decided the case of United States v. Kimbrough, 128 S.Ct. 558, 573-74 (2008), that the holding in Eura was abrogated based upon Kimbrough's determination that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case."  See also U.S. Sentencing Guidelines Amendment 706.[3] Therefore, because Kimbrough had not been decided at the time of Petitioner's sentencing, and the Sixth Amendment does not require attorneys to make arguments based upon anticipated favorable changes in the law, counsel could not have been ineffective for

---

[3] On November 1, 2007, the United States Sentencing Commission adopted Amendment 706 to the U.S. Sentencing Guidelines.  Such Amendment reduces the drug quantity thresholds in U.S.S.G. § 2D1.1 so as to assign, for crack cocaine offenses, base offense levels which correspond to guidelines ranges that include the statutory mandatory minimum penalties.

having failed to challenge the disparity between the punishments for crack and powder cocaine convictions.

This Court also must reject Petitioner's claim that sentencing counsel was ineffective for failing to argue that the controlled substance in question was not crack cocaine but some other form of cocaine base. Rather, while it once was an open question, the Fourth Circuit squarely has held that "cocaine base" -- the substance identified both in Petitioner's Indictment and in the jury's special verdict (Case 5:00CR46, document # 74), by which Petitioner's involvement with "50 grams or more of cocaine base" has been established -- includes what commonly is known as "crack." United States v. Perkins, 108 F.3d 512, 518 (4th Cir. 1997).

Last concerning sentencing counsel, Petitioner contends that she was ineffective for failing to protect his right to be sentenced upon true and accurate information, that claim also must be rejected. Again, notwithstanding the fact that a party to one of the drug transactions which was attributed to Petitioner never was called as a witness by either party, the accuracy and propriety of his sentence already has been approved by the Fourth Circuit Court of Appeals. Waddell, 62 Fed. App'x at 498.

### C. **Appellate Counsel**

Petitioner claims that appellate counsel was ineffective for having raised only a single, weak claim for review and for his

34

handling of the conclusion of Petitioner's appeal.

As to that first argument, Petitioner contends that appellate counsel should have raised the "stronger issue" concerning the violation of his Confrontation rights. . . ." However, the record reflects that Petitioner's claim is factually erroneous to the extent that the Fourth Circuit's opinion shows that appellate counsel raised five separate arguments on Petitioner's behalf. See Waddell, 62 Fed. App'x at 492-97.

Moreover, to the extent that Petitioner's so-called confrontation issue is challenging the propriety of his sentence, such claim must be rejected. That is, this thinly disguised assault on Petitioner's sentencing calculations already has been thoroughly addressed and rejected by the Circuit Court, Waddell, 62 Fed. App'x at 498, and by this Court in the preceding subsection. Therefore, Petitioner cannot possibly establish either deficient performance or prejudice concerning appellate counsel's handling of this claim.

Last as to appellate counsel, Petitioner also claims that he failed to give him copies of the Fourth Circuit's decision until eight months after that decision was rendered. In response, the Government has submitted an Affidavit from counsel in which he denies this claim by asserting that following the issuance of the Circuit Court's decision, counsel advised Petitioner of the outcome before the expiration of the time in which he could have

requested _certiorari_ review had he wanted to do so.

This Court's resolution of Petitioner's claim is guided by the case of <u>United States v. King</u>, 11 Fed. App'x 219 (4th Cir. May 23, 2001) (unpublished). <u>King</u> involved the appeal of the denial by the United States District Court for the Eastern District of Virginia of a motion to vacate on the grounds of ineffective assistance of counsel, including a claim that counsel had failed to advise the petitioner of the disposition of his direct criminal appeal in time for him to petition the Supreme Court for _certiorari_ review. <u>Id</u>. at 220. The district court denied relief on both of the petitioner's claims. <u>Id</u>.

On appeal, the Fourth Circuit affirmed the denial of the claim which was unrelated to the _certiorari_ petition, but vacated the district court's judgment as to the _certiorari_ issue and remanded the case for a determination of whether counsel, in fact, had failed timely to notify Petitioner of the results of his appeal. <u>Id</u>. at 221. Equally critically, the appellate Court explained that in the event the district court found that counsel was deficient as alleged, then the petitioner would be required to move the Fourth Circuit Court for "recall and re-issuance of the mandate in his criminal appeal [], and for appointment of counsel to assist him with any petition for writ of _certiorari_ he may [have wished] to file in the Supreme Court in that case." <u>Id</u>.

Subsequently, in <u>United States v. Brown</u>, 2007 WL 4570544 (W.D.Va. Feb. 6, 2007), the same district court was confronted with several allegations against counsel, including a similar claim that counsel was ineffective for her failure timely to file a <u>certiorari</u> petition for her client after having been asked by the client to do so.  Once again, the district court rejected the non-<u>certiorari</u> related allegations against counsel.  <u>Id</u>. at 2. However, that time, the district court also determined that counsel was ineffective in her handling of the petitioner's re- quest for a <u>certiorari</u> petition, and that "[t]he appropriate remedy for counsel's omission is the reentry of the judgment affirming the original conviction and sentence . . . ."  <u>Id</u>. Indeed, the <u>Brown</u> Court noted that district courts "lack[] authority to grant such a remedy.  Rather, Petitioner must move the Fourth Circuit to vacate and reenter the judgment affirming his original conviction and sentence."  <u>Id</u>., <u>citing</u> <u>King</u>, 11 Fed. App'x at 221.

In the instant case, appellate counsel's affidavit reports that following the Circuit Court's decision counsel notified Petitioner of that matter.  Such statement falls short of conclu- sively establishing that counsel fulfilled his obligation to Petitioner.  Specifically, counsel's Affidavit fails to indicate when, exactly, he notified Petitioner of the result <u>and</u> that the notification was made in writing –– the only unacceptable means.

Nor does the Affidavit report that counsel's notification advised Petitioner of his right to seek further direct review. See Fourth Circuit Local Rule 46(d) and the Fourth Circuit's Plan for Implementation of the Criminal Justice Act of 1964 (requiring timely written notification of the result of an appeal and of the right to petition for certiorari). Indeed, had counsel given Petitioner proper written notice of these matters, he certainly could have submitted a copy of such letter as an exhibit to his Affidavit. Counsel's failure in this regard gives the Court pause and leads the Court to conclude, out of an abundance of caution, that Petitioner's Motion to Vacate should be granted, but solely as to his claim that counsel failed timely to notify him of the result of his criminal appeal. Should Petitioner chose to do so, he may pursue his remedies with the Circuit Court as will be explained more fully in this Court's decretal clause below.

Finally, it goes without saying that since Petitioner has failed to demonstrate that he was subjected to ineffective assistance of counsel in any other regard, he also cannot demonstrate that his attorneys failed to adhere to the prevailing professional norms on the basis of their handling of his other claims.

### III. <u>CONCLUSION</u>

Petitioner has demonstrated that his appellate attorney was ineffective for his failure timely to notify Petitioner of the

outcome of his direct appeal, and the Government has failed sufficiently to overcome that demonstration. Consequently, the Court finds that counsel was deficient in that regard for purposes of this Order only and that Petitioner should be permitted to pursue his remedies on that claim at the Fourth Circuit Court of Appeals. However, consistent with the practice set out in <u>King</u> and <u>Brown</u>, this Court considered Petitioner's remaining claims against his former attorneys, but rejected them as factually and/or legally baseless.

## IV. <u>NOTICE OF APPELLATE RIGHTS</u>

Mr. Waddell, YOU HEREBY ARE ADVISED that this Court has determined that your appellate counsel was ineffective insofar as he failed timely to notify you of the result of your direct appeal and of your right to seek <u>certiorari</u> review as provided under the Plan of the United States Court of Appeals for the Fourth Circuit, in Implementation of the Criminal Justice Act of 1964. Therefore, you may file a motion with the Fourth Circuit Court of Appeals asking that Court to vacate its Judgment affirming your appeal and to reenter such Judgment so that you can file a Petition for a Writ of <u>Certiorari</u> in the Supreme Court. If you desire the assistance of counsel to help with the filing of your <u>certiorari</u> petition but cannot afford to hire counsel, you may ask the Fourth Circuit Court of Appeals to appoint counsel to assist you in pursuing further relief on your direct appeal.

In addition, you may appeal this Court's decision on your remaining claims at the Fourth Circuit Court of Appeals.  In either case, your motion and appeal must be filed no later than thirty days after the entry of this Order.

If you previously were determined to be indigent in connection with your criminal case, or if you now are indigent and are unable to pay for an appeal, you may request permission to proceed on appeal without having to pay the applicable filing fees.

**V.  ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Petitioner's Motion to Vacate (document # 1) is **GRANTED in part** for the sole purpose of granting him limited relief on his claim that his appellate attorney failed timely to provide him with notice of the results of his direct appeal and of his right to file a Petition for a Writ of Certiorari in the Supreme Court.  However, such Motion to Vacate is **DENIED in part** as to the remaining claims raised therein.

2.  Consistent with the preceding paragraph, the Government's de facto motion for summary judgment (document # 9) is **DENIED in part** and **GRANTED in part.**

3.  Petitioner may file a motion with the Fourth Circuit seeking to have the Judgment affirming his direct appeal reentered and may appeal this Court's Judgment (i.e., the instant Order) as has been explained in this Order; and

5.   That the Clerk shall send copies of this Order to
Petitioner, the United States Attorney for the Western District
of North Carolina, and to the Clerk of the Fourth Circuit Court
of Appeals.

**SO ORDERED.**

Signed: January 26, 2009

Richard L. Voorhees
United States District Judge